UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**RICHARD S. GALLINA and HORNE
BROTHERS CONSTRUCTION, INC.,**

> **Plaintiffs,**

**vs.**                                                            **Case No.: 8:06-CV-1529-T-27EAJ**

**COMMERCE AND INDUSTRY
INSURANCE;** *et al.*

> **Defendants.**

_____/

## ORDER

**BEFORE THE COURT** are Commerce & Industry Insurance Company's Dispositive

Motion for Summary Judgment (Dkt. 75), Plaintiffs' Response in Opposition (Dkt. 74), Plaintiffs'

Motion for Summary Judgment Against Commerce & Industry Insurance (Dkt. 77), and Commerce

& Industry Insurance Company's Response in Opposition (Dkt. 83). Upon consideration, Commerce

& Industry Insurance Company's motion for summary judgment is **GRANTED**. Plaintiffs' motion

for summary judgment is **DENIED**.

### Factual Background

Defendant Commerce & Industry Insurance Company ("Commerce") issued a Workers'

Compensation and Employers Liability Policy (the "Policy") to Horne Brothers Communication, Inc.

for the period of December 31, 2000 to December 31, 2001. (Dkt. 75, Ex. B). The Policy includes

a "Duty to Defend" provision, which in relevant part provides:

> We have the right and duty to defend, at our expense, any claim, proceeding or suit
> against you for damages payable by this insurance. We have the right to investigate

1

and settle these claims, proceedings and suits.

(Dkt. 75, Ex. B, Part One - Workers Compensation Insurance, § C; Part Two - Employers Liability

Insurance, § D).  The Policy also includes a "Voluntary Payment" condition, which in relevant part

provides:

> Tell us at once if injury occurs that may be covered by this policy.  Your other duties
> are listed here:
>
>                 \*   \*   \*
>
> 4.  Cooperate with us and assist us, as we may request, in the investigation,
> settlement or defense of any claim proceeding or suit.
>
>                 \*   \*   \*
>
> 6.  Do not voluntarily make payments, assume obligations or incur expenses,
> except at your own cost.
>
>                 \*   \*   \*

(Dkt. 75, Ex. B, Part Four - Your Duties if Injury Occurs).   Additionally, the Policy includes the

following  "Actual Trial" provision:

> There will be no right of action against us under this insurance unless:
>
> 1.  You have complied with all the terms of the policy; and
> 2.  The amount you owe has been determined with our consent or by actual trial and final
> judgment.

(Dkt. 75, Ex. B, Part Two - Employers Liability Insurance, § I Actions Against Us).

On February 17, 2001, Plaintiff Richard Gallina ("Gallina") was injured while constructing

a cellular tower for his employer and Commerce's insured, Horne Brothers Construction, Inc.

("Horne").[1]   Following the accident, Gallina filed a workers' compensation suit against Horne.

---

[1] Commerce does not dispute that the Policy issued to Horne Brothers Communications, Inc. applies to Horne
Brothers Construction, Inc.

2

(Dkt. 75, Ex. C, pp. 24-25). Separately, Gallina initiated a tort action against Horne and the parties responsible for the design and manufacture of the gin pole and self supporting tower which allegedly caused his fall. (Dkt. 77, Ex. B, Fourth Amended Complaint).

In Gallina's tort action, he alleged that Horne instructed him "to utilize the [g]in [p]ole in a 'Chicago Boom' type configuration without the proper engineering backup or protocol in place. . . . [and that Horne] knew or reasonably should have known ('objective standard') that the use of such method was substantially certain to result in injury or death to [Gallina], yet did not warn or instruct its employee of that fact." (Dkt. 77, Ex. B, ¶ 24). Gallina's cause of action against Horne was premised on the substantial certainty exception to tort immunity protection provided to employers pursuant to Florida's Workers' Compensation Act.

Upon notice that Horne was named as a defendant in Gallina's complaint, Commerce assumed Horne's defense and hired attorney James Brown of Wicker Smith O'Hara McCoy Graham & Ford, P.A. ("Wicker Smith"). (Brown Depo., p. 13; Estes Depo., pp. 40-41). Wicker Smith gathered documents, reviewed the discovery which had occurred, including depositions of several Horne employees, and provided numerous evaluations of the claims to Horne and Commerce in the form of evaluation reports, deposition summaries, and forms called "Agreed to Litigation Plans." (Brown Depo., pp. 78-80). On Horne's behalf, Wicker Smith conducted additional discovery, retained experts and raised several defense theories, including (1) workers' compensation tort immunity; (2) the election of remedies doctrine; (3) and that the use of the gin pole was standard practice in the industry at the time of Gallina's accident. (Dkt. 76, Exs. E, F).

Throughout Wicker Smith's defense of Horne, counsel continued to provide Commerce with reports and opinions concerning Horne's potential exposure to liability. Specifically, Wicker Smith

reported to Commerce that "[a]n Engineer's Investigative Report regarding the cause of the collapse . . . determined . . . that the gin pole failed because it was not being appropriately used. . . . [and] no proper instructions were provided to the insured employees. " (Estes Depo., p. 56). Wicker Smith opined that "[b]ased on all the facts and information known at this time, there may be significant liability on the part of the insured. This is primarily due to expert engineer's investigation report which expressly states that the boom was used improperly and that the employees of the insured were not given appropriate instructions on the use and operation of the gin pole." (Estes Depo., pp, 66-67).

Wicker Smith notified Commerce that the evidence "demonstrates that there were not sufficient procedures and policies in place with respect to the gin pole used at the time of [Gallina's] fall. . . . [and Gallina] will likely show that the safety director and the crew chief should have known that the Chicago boom method of rigging was an engineered pick and should not have been used without an engineer." (Estes Depo., pp. 86-87). Wicker Smith notified Commerce numerous times that despite the defenses asserted, Gallina's claims exposed Horne to "significant liability." (Estes Depo., pp. 107-08, 152, 157, 165, 170, 190-192, 209-10, 213-14).

Sometime in "late 2005 or early 2006," Horne retained Daniel Mitchell of Gray Robinson, P.A. ("Gray Robinson") as personal counsel in the Gallina action. (Mitchell Depo., p. 12). However, Commerce continued to provide Horne with a full defense through Wicker Smith's representation. (Mitchell Depo., p. 83).

In April 2006, Gallina filed a motion for leave to amend his complaint to assert a claim for punitive damages against Horne. On Horne's behalf, Wicker Smith defended against Gallina's motion and filed a memorandum of law in opposition. (Mitchell Depo., pp. 82-83). Wicker Smith

also moved for summary judgment on Gallina's tort claim against Horne, arguing (1) summary judgment was proper because Gallina failed to meet the evidentiary burden required by the "substantial certainty" exception to tort immunity; and (2) summary judgment was proper because pursuant to Florida's election of remedies doctrine, Gallina was precluded from pursuing a tort claim against Horne because he had filed a workers' compensation claim. (Brown Depo., pp. 18-19).

On April 5, 2006, Horne's personal counsel requested that Commerce confirm or deny coverage for Horne as to Gallina's tort claims. (Dkt. 75, Ex. H). In response, on May 1, 2006, Commerce reserved its right to deny coverage if a jury's finding against Horne was based on intentional conduct, which according to Commerce was excluded by the Policy. (Dkt. 75, Ex. I). Despite its reservation of rights, Commerce continued to provide Horne with a full defense. Commerce, not Horne, paid for all legal services provided by and all invoices generated by Wicker Smith. (Horne Depo., p. 72).

On May 3, 2006, Horne's personal counsel demanded that Commerce make the Policy limits available to try to settle the claims against Horne. (Dkt. 77, Ex. F). On May 24 and 25, 2006, the parties participated in mediation. (Gunn Depo., p. 110). The trial of Gallina's claims was scheduled for July 2006. A hearing on Gallina's motion to amend the complaint to add a claim for punitive damages and Horne's motion for summary judgment was set for late May or early June 2006.[2] (Gunn Depo., p. 110; Dkt. 84, Ex. D).

At the mediation, Commerce withdrew its reservation of rights. (Mitchell Depo., pp. 22-23; Brown Depo., pp. 58-59; Dkt. 75, Ex. J). During mediation, Gallina offered to settle for $500,000,

---

[2] The activity notes from Commerce claims adjuster Robert Estes indicate that the state court judge was ill and that the hearings had to be rescheduled. (Dkt. 84, Ex. D).

5

the release of the workers' compensation lien, an assignment of rights, and Commerce and Horne's participation with Gallina in a *Coblentz* agreement, which would permit the pursuit of further recovery from Gallina's excess carrier, Commercial Union Insurance Company, which had denied coverage of Gallina's claims.[3]  (Mitchell Depo., pp. 29-30).  In exchange, Gallina would agree not to execute the judgments against Horne, offering Horne full financial protection.  (Estes Depo., p. 267; Gunn Depo., pp 16, 78, 127-28).  Horne's personal counsel believed that Gallina's $500,000 offer was negotiable.[4]  (Mitchell Depo., pp. 29-30; Estes Depo., p. 267).  Brown, of Wicker Smith, also believed Gallina's $500,000 figure was negotiable.  (Brown Depo., p. 69).  Neither Brown nor Mitchell recalled Gallina's counsel telling them that the $500,000 was a "drop-dead number." (Brown Depo., p. 69; Mitchell Depo 29-30).

Negotiations continued between counsel after recess of the two day mediation.  (Mitchell Depo., p. 69).  Commerce's claims adjuster, Robert Estes, had $300,000 in settlement authority and the ability to seek additional settlement authority if necessary.  (Mitchell Depo., pp. 64, 78-79; Dkt. 84, Ex. D).  Horne's personal counsel testified that "there seemed to be a consensus between . . . myself and Mr. Brown  – the defense team, if you will – that 300,000 was not an unreasonable payout . . .  given the totality of the circumstances."  (Mitchell Depo., p. 78).

On May 31, 2006, Commerce offered to settle the intentional tort claim against Horne for $200,000 without a release of the workers' compensation lien, but would agree to cooperate with

---

[3] A "Coblentz agreement" is an agreement whereby the insured settles directly with the claimant due to the insurer's refusal to provide a defense.  *See Coblentz v. American Surety of N.Y.*, 416 F.2d 1059 (5th Cir. 1969).

[4] Mitchell testified that he knew "Lee Gunn [Gallina's counsel] for a long time too – [he] had dealings with Lee Gunn that go all the back to the early '80's when he was [Mitchell's] associate back at the old Shackleford Farrior firm – so [he] ha[d] a pretty good feel for when he's firm on it and when he's not firm on it."  (Mitchell Depo., p. 30).

Gallina's pursuit against Horne's excess carrier, Commercial. (Mitchell, pp. 78-79). Soon after Commerce relayed its $200,000 counter-offer, Gallina's counsel contacted Horne's personal counsel, told him he felt Commerce's $200,000 offer was a "low-ball number," and solicited Horne's involvement in a *Coblentz* agreement against Commerce and Commercial. (Mitchell Depo., pp 66-67, 71-73; Brown Depo., pp. 70-72). Horne's personal counsel believed the *Coblentz* agreement was a very "novel theory" because Commerce had not made a reservation of rights with regard to punitive damages, but as long as Horne was fully released and Gallina accepted the risk, he was not concerned. (Mitchell Depo., pp. 32, 65-66, 97-98). Horne's personal counsel's sole concern at that point was to get a full release for Horne. He did not care "whether it came about as a straight money payout by Commerce, [or] whether it came about as a *Coblentz* agreement that did not involve Commerce in a role of an ally but rather in an adversarial role as a target . . ." (Mitchell Depo., p. 66). Prior to agreeing to the *Coblentz* agreement, Horne's personal counsel did not contact Commerce or Wicker Smith to determine the status of settlement negotiations. (Mitchell Depo., p. 72).

On June 1, 2006, Horne's personal counsel notified Commerce by email that Horne was rejecting Commerce's defense due to its "reservation of rights for non coverage of punitive damages" and that Horne was assuming its own defense of the Gallina action. (Dkt. 75, Ex. K). Horne and Gallina executed the *Coblentz* agreement the very next day on June 2, 2006. (Dkt. 75, Ex. L). At the time the *Coblentz* agreement was entered into, Horne's motion for summary judgment and Gallina's motion to amend to assert punitive damages remained pending. (Mitchell Depo., pp. 54, 82-83).

The *Coblentz* agreement included an assignment to Gallina of any rights Horne had against

7

Commerce and Commercial. (Dkt. 75, Ex. L). Horne consented to the entry of a five million ($5,000,000) compensatory damage judgment and a two million ($2,000,000) punitive damage judgment against itself. (Dkt. 75, Ex. L). In return, Gallina agreed not to enforce the consent judgments against Horne. (Mitchell Depo., pp. 71-73). Commerce was not notified of Horne and Gallina's settlement by way of a *Coblentz* agreement until after Horne executed the agreement.[5] (Mitchell Depo., p. 102). After learning of the agreement, Commerce issued a coverage denial on the basis of Horne's rejection of the defense and entry into the settlement agreement without Commerce's consent.

On August 18, 2006, Horne and Gallina initiated this action against Commerce and Commercial. (Dkt. 2). In the Amended Complaint, Plaintiffs seek a declaratory judgment against Commerce, declaring that:

(1) Commerce "was obligated pursuant to the terms and conditions of the Commerce policy and its implied fiduciary duties to fairly and reasonably evaluate the claims against Horne and make reasonable efforts to resolve those claims at, or within, its available policy limits so as to protect Horne and its assets" and;

(2) "Commerce, through its course of conduct, breached its fiduciary and other contractual obligations to Horne by failing to timely undertake settlement discussions, asserting meritless coverage positions in an effort to leverage a settlement, and by placing its interests before those of Horne in making low ball settlement offers for its own financial gain" and;

---

[5] Wicker Smith counsel, James Brown, testified that he learned that Horne had entered into a *Coblentz* agreement "shortly after [ ] conversations broke down as far as getting a settlement . . . we were working towards trying to get it settled. . . [s]hortly after that is when it happened, within a couple of days . . ." (Brown Depo., pp. 70-71).

8

(3) "That in light of Commerce's conduct, Horne reasonably rejected the defense being offered by Commerce under reservation . . ." and;

(4) "That Commerce is obligated to indemnify the Judgments against Horne, together with interest . . ." and that "Plaintiffs are entitled to an award of attorney's fees and taxable costs." (Dkt. 2, pp. 14 - 15).

Plaintiffs also allege claims for breach of contract and bad faith, arguing Commerce breached the Policy "by failing to investigate and evaluate the claims against Horne and to make funds up to its policy limits available for the full and final settlement of those claims consistent with a prompt, fair and reasonable evaluation of the claims." (Dkt. 2, ¶ 57).   In connection with their bad faith claims, Plaintiffs allege Commerce breached its duty of good faith by "failing to timely initiate settlement discussions, . . . failing to make its policy limits available, . . .asserting spurious and meritless coverage positions. . . . completely disregarding the interests of Horne in being protected from potential excess compensatory judgments and punitive damages awards, and making low ball settlement counteroffers . . .   when . . . reasonable evaluation of the claims against Horne  . . indicated that the exposure to Horne clearly exceeded Commerce's available policy limits." (Dkt. 2, p. 21-22).

Commerce has moved for summary judgment on Plaintiffs' claims, arguing claims for bad faith and breach of the implied duty of good faith require an excess judgment after trial where the insurer provides a defense and accepts coverage. (Dkt. 75). Plaintiffs have also moved for summary judgment, arguing Commerce's rejection of a reasonable settlement opportunity within Policy limits constitute breach of contract and bad faith. (Dkt. 77).

## Applicable Standard

Summary judgment is proper if following discovery, the pleadings, depositions, answers to interrogatories, affidavits and admissions on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56. "An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259-60 (11th Cir. 2004) *(internal citations omitted)*. "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Id.* at 1260. All the evidence and factual inferences reasonably drawn from the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1280 (11th Cir. 2004).

Once a party properly makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, whether or not accompanied by affidavits, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 323-24. Plaintiff's evidence must be significantly probative to support the claims. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986).

The Court will not weigh the evidence or make findings of fact. *Anderson*, 477 U.S. at 249; *Morrison v. Amway Corp.*, 323 F.3d 920, 924 (11th Cir. 2003). Rather, the Court's role is limited to deciding whether there is sufficient evidence upon which a reasonable juror could find for the non-moving party. *Id.*

## Choice of Law

A federal court sitting in diversity must apply the choice of law rules of the forum state.

*Klaxton Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *Broyles v. Bayless*, 878 F.2d 1400, 1402 (11th Cir. 1989). Thus, in determining what law should apply to Plaintiffs' claims, this Court must apply Florida's choice of law rules.[6]

In Florida, when an insured brings an action against his carrier for failure to settle a third party's claim, the action sounds in contract. *Teachers Ins. Co. v. Berry*, 901 F. Supp. 322, 324 (N.D. Fla. 1995) (citing *Swamy v. Caduceus Self Ins. Fund, Inc.*, 648 So. 2d 758, 760 (Fla. 1st DCA 1994)). "[B]ecause an insurer's duty to an insured to act in good faith in settling a third party insurance claim is bottomed on the insurance contract between the parties, under Florida law, the same is, for choice of law purposes, an action *ex contractu* rather than tort." *Teachers*, 901 F. Supp. at 324 (citing *Government Employees Ins. Co. v. Grounds*, 332 So. 2d 13 (Fla. 1976)).

Here, Plaintiffs' breach of contract and bad faith claims concern the manner in which Commerce went about representing Horne's interest under the Policy, *i.e.*, the effort Commerce made to consummate settlement. Under Florida law, this type of claim concerns the "performance under the insurance policy [rather] than the execution or interpretation of the [policy]." *Teachers*, 901 F. Supp. at 324. Under traditional conflict of law principles, "matters concerning performance [of an insurance policy] are determined by the law of place of performance . . . ." *Id.* (citing *Grounds*, 332 So. 2d at 14-15; *Adams v. Fidelity & Cas. Co.*, 920 F. 2d 897, 899 n. 5 (11th Cir. 1991)). Accordingly, the choice of law rule that governs is not the law of *lex loci contractus*, but rather, the law of place of performance. *Teachers*, 901 F. Supp. at 324.

Commerce's performance under the Policy was in Florida, as it is undisputed that Gallina was injured and filed suit against Horne in Florida. The negotiations for settlement that occurred

---

[6] It is undisputed that the Policy does not include a choice of law provision.

between counsel for Commerce, Horne and Gallina also occurred in Florida. Accordingly, Plaintiffs'
declaratory action, breach of contract and bad faith claims, all of which hinge on Plaintiffs'
allegation that Commerce acted in bad faith in not settling Gallina's claims within the Policy limits,
are governed by Florida substantive law.

## Discussion

Commerce contends summary judgment on Plaintiffs' claims is appropriate because where,
as here, Commerce defended Horne and accepted coverage without a reservation of rights, claims
for bad faith and breach of the implied duty of good faith require an excess judgment after a trial.
(Dkt. 75). Alternatively, Commerce argues that the undisputed facts establish that Commerce
proceeded in good faith and that Horne breached the Policy's "Actual Trial" and "Voluntary
Payment" conditions. (Dkt. 75). Plaintiffs contend summary judgment in their favor is appropriate
because Commerce's failure to make an honest and intelligent evaluation of the claims against Horne
and its rejection of a reasonable settlement opportunity within Policy limits constitute a breach of
contract and bad faith as a matter of law. (Dkt. 77).

## Breach of Implied Duty of Good Faith and Bad Faith Claims[7]

Commerce contends Plaintiffs cannot succeed on their claims because Commerce was
unequivocally and irrevocably defending Horne when Horne prematurely concluded Gallina's
underlying tort action by rejecting Commerce's defense and agreeing to consent judgments with
Gallina without the knowledge and consent of Commerce. (Dkt. 75, p. 8). Commerce argues that

---

[7] The breach of the contractual duty of good faith and common law bad faith are "two sides of the same coin."
*North American Van Lines, Inc. v. Lexington Ins. Co.*, 678 So. 2d 1325, 1330 (Fla. 4th DCA 1996) ("[when] bad faith
in negotiating a settlement is alleged, the cause is one for breach of a contractual obligation implied in law, namely good
faith"). Plaintiffs' claim for declaratory judgment is also subsumed in their bad faith claim because they seek a judgment
declaring that Commerce breached its duty to act in good faith.

under these facts there is no basis for excusing the requirement that an excess verdict subjecting the insured to liability in excess of the policy limits be entered before the insured can pursue a bad faith claim. (Dkt. 75, p. 8).

Plaintiffs disagree and argue that an excess judgment in Gallina's underlying tort action is not required because Commerce breached its fiduciary obligations to Horne when it failed to accept Gallina's settlement offer within the Policy limits. (Dkt. 84, p. 11). Plaintiffs contend Commerce's conduct justified Horne's rejection of Commerce's defense and its decision to enter into a settlement agreement without Commerce's consent, despite the Policy language prohibiting Horne from doing so. (Dkt. 84, p. 11). Plaintiffs' contentions are without merit, considering the undisputed facts of record and the language of the policy.

In Florida, an excess judgment is an element of a bad faith claim. *Cunningham v. Standard Guaranty Ins. Co.*, 630 So. 2d 179, 181 (Fla. 1994)("Under ordinary circumstances, a third-party must obtain a judgment against the insured in excess of the policy limits before prosecuting a bad faith claim against the insured's liability carrier."); *see also Macola v. Gov't Employees Ins. Co.*, 953 So. 2d 451, 455 (Fla. 2006) ("the basis for [a bad faith] action remain[s] the damages of an insured from the bad faith action of the insurer which caused its insured to suffer a judgment for damages above his policy limits"); *Fidelity & Casualty Co. of New York v. Cope*, 462 So. 2d 459, 461 (Fla. 1985) ("an essential ingredient to any cause of action is damages").

Florida courts have recognized only a few well defined exceptions to this general principle. For example, if the insurer denies coverage and refuses to handle the insured's defense, Florida law permits the insured to undertake its own defense and pursue a bad faith claim without entry of an excess judgment. *See Coblentz*, 416 F.2d at 1059.

13

A second exception is recognized where an insurer offers to defend the insured under a reservation of rights as to coverage. In that circumstance, the insured may reject the defense, enter into a settlement, and pursue a bad faith claim without an excess judgment. *See Taylor v. Safeco Ins. Co.*, 361 So. 2d 743 (Fla. 1st DCA 1978).

Finally, the Florida Supreme Court has held that an excess judgment is not required if the insurer and the third party claimant stipulate to try the bad faith case before trying the underlying negligence claim. *Cunningham*, 630 So. 2d at 182 (stipulation between the parties is functional equivalent of an excess judgment).

This case does not fall within any of those exceptions. The undisputed facts demonstrate that on or about May 24, 2006, during mediation, Commerce withdrew its May 1, 2006 reservation of rights and was unconditionally defending Horne when Horne rejected Commerce's defense and entered into the settlement with Gallina without Commerce's consent.

Relying on *Bellsouth Telecommunications, Inc. v. Church & Tower of Florida, Inc.*, 930 So. 2d 668 (Fla. 3d DCA 2006), Plaintiffs contend that Commerce's May 1, 2006 reservation of rights transferred the power to conduct its own defense to Horne and that once transferred, Commerce was not able to "take it back."  (Dkt. 84, p. 15).  Plaintiffs' reliance on *Bellsouth* is misplaced.

In *Bellsouth*, the insurer refused to defend its insured because of late notice. *Bellsouth*, 930 So. 2d at 670.  As a result, the insured was forced to assume its own defense against the claim and file a declaratory action against its insurer. *Id.*  During the course of the declaratory action and after the insured moved for summary judgment against the insurer, the insurer retracted its position regarding notice and sought to take over the insured's defense, including appointing new defense counsel. *Id.*  At that point, the insured's attorney had defended the insured in the underlying action

14

for over a year. *Id.* Accordingly, the court found that the insured would suffer material harm if forced to relinquish control of its defense to the insurer. *Id.* The court concluded that the insurer had waived its right to control the defense by refusing to defend the insured. *Id.* at 672.

In contrast, Commerce did not waive its right to defend Horne. From the inception of Gallina's action against Horne, Commerce provided a defense to Horne through Wicker Smith's representation. Wicker Smith conducted discovery, obtained and reviewed expert opinions, filed a motion for summary judgment on Horne's behalf, and defended against Gallina's motion to add a claim for punitive damages.[8] Horne was not forced to provide its own defense and therefore suffered no harm by Commerce defending under a reservation of rights from May 1, 2006 until it withdrew its reservation on approximately May 24, 2006.

Plaintiffs concede that Commerce never issued a reservation of rights with respect to coverage for punitive damages. Plaintiffs' contention that Commerce "constructively" reserved its rights with regard to punitive damages is unpersuasive. In support of their contention, Plaintiffs' rely on a May 2, 2006 email from Commerce claims adjuster Robert Estes to Horne's personal counsel, in which Estes stated that if Gallina was permitted to add a claim for punitive damages, Commerce would deny coverage. (Dkt. 77, Ex. H; Dkt. 84, Ex. B).

Plaintiffs cite no authority for their argument that Estes's communication with Horne's personal counsel constitutes a "constructive" reservation of rights. When Horne rejected Commerce's defense, Gallina's motion to add a claim for punitive damages had not been ruled on. Regardless of whether punitive damages were or were not covered under the Policy, the record evidence demonstrates that when Horne rejected Commerce's defense and entered into the *Coblentz*

---

[8] Horne's personal counsel had no criticisms of Wicker Smith's defense of Horne. (Mitchell Depo., p. 83).

agreement, Commerce was providing a defense as to both compensatory and punitive damages and was not defending under a reservation of rights.  Unlike the insurer in *Ging v. American Liberty Ins. Co.*, 423 F.2d 115 (5th Cir. 1970), who was found to have acted in bad faith, Commerce fulfilled its duty to defend Horne against "the mere possibility of a non-covered claim for punitive damages." *Compare Ging*, 432 F.2d at 118 (insurer acted in bad faith where insurer undertook duty to defend in action for compensatory and punitive damages, but failed to notify insured of settlement offers, failed to warn about likelihood of non-covered punitive damages award, failed to file post trial motion with respect to award for punitive damages, and failed to conduct settlement negotiations in good faith).

Nor do the undisputed facts excuse the requirement of an excess judgment under the reasoning and holding in *North American Van Lines, Inc. v. Lexington Ins. Co.*, 678 So. 2d 1325 (Fla. 4th DCA 1996) ("NAVL").  In *NAVL*, the insurer of an indemnity policy continued to delay and essentially obstructed settlement between its insured and the claimant for one year. *NAVL*, 678 So. 2d at 1332-33.  The indemnity policy in that case required the insured to cover the cost of its defense. Therefore, the insurer's delay directly impacted its insured's cost of defending against the claim. *Id.* at 1329.  On the eve of trial, the insured settled with the claimant without the insurer's consent. *Id.* at 1328.  The court held that an excess judgment was not necessary prior to the insured pursuing a bad faith claim even though the insured defied the policy conditions by settling without the insurer's consent. *Id.*  The court reasoned that by refusing to settle the claims and substantially delaying settlement, the insurer breached its obligation of good faith to its insured. *NAVL*, 678 So. 2d at 1333.

Plaintiffs argue that Horne was likewise justified in entering into a settlement agreement without Commerce's consent and in defiance of the Policy conditions because, like the insurer in

16

*NAVL*, Commerce breached its duty of good faith by failing to accept Gallina's $500,000 settlement offer and by counter-offering with a "low ball number." However, the facts in *NAVL* are distinguishable from those in this case in several important respects. First, the insurer in *NAVL* had issued an indemnity policy, which obligated the insured to handle all claims and conduct its own defense. *NAVL*, 678 So. 2d at 1329. The insurer in *NAVL* did not have a duty to defend and did not have the right to exclusive control over the management and resolution of the litigation against the insured. *Id.* The insured, not the insurer, was responsible for all defense costs. *Id.* Thus, any delay in settlement had a direct impact on the insured's cost of defense. *Id.*

In contrast, here, Commerce had a contractual duty to provide a defense to Horne and a contractual right to manage the litigation and resolution of the claims against Horne. Unlike the insured in *NAVL*, Horne had incurred no damages as a result of Commerce's failure to accept Gallina's settlement offer at mediation. Commerce had paid all of Horne's defense costs and had agreed to continue to pay all future defense costs without any reservation as to coverage.

While insurers under indemnity and liability policies share the same duty to act in good faith, under a standard liability policy, where the policy requires the insurer to defend as well as settle the case, "the insurer does not breach its obligations until an excess judgment which exposes the insured to liability is entered." *NAVL*, 678 So. 2d at 1333. In *NAVL*, the court recognized this important requirement with respect to liability policies:

> [T]he practical reason underlying the requirement of an excess judgment in standard liability insurance cases is that until the insured is personally exposed to liability, the insured suffers no damages. Such a policy requires the insurer to defend as well as settle the case, and the insurer does not breach its obligations until an excess judgment which exposes the insured to liability is entered.

*Id.*

17

Horne's premature rejection of Commerce's defense and its settlement with Gallina foreclosed a determination of whether Horne would be exposed to liability for damages in excess of the Policy, as contemplated by the Policy and Florida law. Simply put, the undisputed facts of this case did not excuse Horne from complying with the Policy's requirement that it obtain a determination of damages either with Commerce's consent or after a trial and judgment. Nor do the facts warrant an exception to the long standing Florida rule which requires an excess verdict subjecting the insured to personal liability in excess of the policy limits be entered before a bad faith claim against the insurer under a standard liability policy may be pursued. Accordingly, summary judgment against Plaintiffs on their claims for declaratory judgment, breach of contract, and bad faith is appropriate. It is, therefore,

**ORDERED AND ADJUDGED** that:

1)  Plaintiffs' Motion for Summary Judgment Against Commerce & Industry Insurance (Dkt. 77) is **DENIED**.

2)  Commerce & Industry Insurance Company's Dispositive Motion for Summary Judgment (Dkt. 75) is **GRANTED**.

3)  The Clerk is directed to enter judgment in favor of Commerce on Plaintiffs' declaratory judgment, breach of contract and bad faith claims.

**DONE AND ORDERED** in chambers this 30th day of September, 2008.

**JAMES D. WHITTEMORE**
**United States District Judge**

Copies to: Counsel of Record

18