UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

RICHARD S. GALLINA and HORNE
BROTHERS CONSTRUCTION, INC.,

Plaintiffs,

vs.                                                                                         Case No.: 8:06-CV-1529-T-27EAJ

COMMERCE AND INDUSTRY
INSURANCE; *et al.*

Defendants.
_____/

## ORDER

**BEFORE THE COURT** are Commercial Union Insurance Company's Motion for Summary Judgment (Dkt. 65), Plaintiffs' Memorandum of Law in Opposition (Dkt. 82), Plaintiffs' Motion for Summary Judgement Against Defendant Commercial Union Insurance Company (Dkt. 76) and Commercial Union Insurance Company's Response in Opposition (Dkt. 80). Upon consideration, Commercial Union Insurance Company's motion for summary judgment is **GRANTED**. Plaintiffs' motion for summary judgment is **DENIED**.

### Factual and Procedural Background

Horne Construction, Inc. ("Horne Construction"), a North Carolina corporation, was in the business of clearing land and building the bases for steel cellular towers. (Horne Depo., pp. 14-16, 24-25). Eventually, Horne Construction began erecting the cellular towers as well. (Horne Depo., pp. 14-16). Charles Horne was the Vice President of Horne Construction. (Dkt. 76-11, Ex. F, ¶ 2). During the relevant time frame, Callahan, Beck & Rice ("CBR") was Horne Construction's

insurance agent.[1]

Sometime in 1997, Defendant Commercial Union Insurance Company ("Commercial") underwrote an insurance package for Horne Construction, which was issued and delivered to CBR in North Carolina. The package included coverage for workers' compensation, business auto, commercial general liability, and umbrella coverage over each. (Rice Depo., pp. 57-59). Each of the policies was separate and subject to separate underwriting. (Rodebaugh Depo., pp. 72-100).

When Commercial initially issued the insurance package, CBR informed Commercial that Horne Construction was in the business of clearing and grading land and pouring the concrete foundations for steel cellular towers. (Dkt. 65, Ex. D; Rice Depo., p. 5). At that time, Horne Construction did not erect cellular towers. (Dkt. 65, Ex. C, Horne Depo., pp. 7-8). The "Application" for the Commercial Policy included the following "01/26/98" notation printed in the "Policy Wide Comment" section: "Applicant clears, grades and installs concrete base pad on sites for cellular phone tower construction. They do not erect towers or have anything to do with the phone operations." (Dkt. 65, Ex. K).

Sometime later, Horne Construction became a general contractor and subcontracted out the tower erection duty. (Horne Depo., pp. 7 - 11). According to Charles Horne, sometime "prior to 2000 . . . it could [have] been '99 . . . [i]t could have been '98," Horne Construction began using its own employees to erect the cellular towers. (Horne Depo., p. 9).

On November 30, 1999, Commercial sent a letter to CBR relaying its concern about Horne Construction's "new involvement in [the] erection of towers." (Dkt. 65, Ex. E). Commercial

---

[1] Throughout the parties' motions and within the exhibits, CBR is interchangeably referred to as Callahan & Rice Insurance Group, Inc. or "C&R."

notified CBR that "the exposure of working at heights is too severe for [Commercial] to continue" and stated "that if the tower erection is going to continue [Commercial] cannot remain on the account." (Dkt. 65, Ex. E). Commercial advised CBR that Horne Construction needed to "replace the [Workers' Compensation] account . . ." (Dkt. 65, Ex. E). Commercial explained that "[i]f [Horne Construction] go[es] back to handling that exposure by subcontractors as they did when the account was originally written [Commercial] may be able to consider continuing the [Workers' Compensation] . . ." (Dkt. 65, Ex. E). According to Charles Horne, Commercial never mentioned a limitation in coverage afforded by the Umbrella Policy. (Dkt. 76, Ex. F., Horne Aff., ¶ 5).

In response, on December 2, 1999, CBR notified Commercial that Horne Construction intended to "setup a separate corporation to handle the tower exposure." (Dkt. 65, Ex. F). CBR requested a thirty day extension to allow Horne Construction to incorporate a separate entity to handle tower erection services. (Dkt. 65, Ex. F).

On December 30, 1999, Charles Horne incorporated a separate entity named Horne Brothers Communications, Inc. ("Horne Communications"). (Dkt. 65, Ex. H). Horne Communications had the same registered agent, same mailing address, and the same officers as Horne Construction. (Dkt. 65, Ex. H; Horne Depo., pp. 25-7). Horne Communications obtained workers' compensation and employers liability coverage from Defendant Commerce and Industry Insurance ("Commerce") pursuant to policy number WC 938-56-99. (Dkt. 2, Ex. C). The relevant policy period was December 31, 2000 to December 31, 2001, with bodily injury liability limits of one million dollars ($1,000,000.00). (Dkt. 2, Ex. C). Horne Communications, not Horne Construction, was the named insured on the Commerce Policy. (Dkt. 2, Ex. C).

Charles Horne testified that he intended that Horne Communications would employ workers

for the purpose of erecting the towers. (Horne Depo., pp. 20-21). However, Horne Communications as an entity "never worked . . . never got off the ground . . . [n]ever had any employees and it never transacted a dollar's worth of business." (Horne Depo., pp. 20-21). Even after Horne Communications was incorporated, Horne Construction continued to use its employees to perform the cellular tower erection work. (Horne Depo., pp. 20-3, 29).

In December 1999, the Commercial Umbrella Policy, policy number CZDW69305, was renewed. (Rodebaugh Depo., pp. 42, 81-84, 114-117; Dkt. 65, Ex. A). The relevant policy period was December 5, 2000 to December 5, 2001, with liability limits of ten million dollars ($10,000,000.00). (Dkt. 65, Ex. A). In relevant part, the Umbrella Policy provides that Commercial "will pay those sums that the 'insured' becomes legally obligated to pay as damages in excess of 'underlying insurance,' or of the 'self-insured retention' when no 'underlying insurance' applies, because of 'bodily injury,' 'property damage,' 'personal injury' or 'advertising injury' to which this insurance applies." (Dkt. 65, Ex. A, Section 1- Coverages, 1a). The Workers' Compensation Policy issued by Commerce to Horne Communications was not listed as a policy covered by the Umbrella in the "Schedule of Underlying Insurance" or the Declarations. (Dkt. 65, Ex. A).

In January 2001, Horne Construction contracted with Progress Telecommunications, Inc. ("Progress") for the erection of a steel cellular tower in Inverness, Florida. (Dkt. 76, Ex. A). In Article I of the contract, the services to be provided by Horne Construction "include[d], but [were] not [ ] limited to such things as constructing the foundations for tower support, receiving/offload/inventory of tower, accessories and anchor bolts, *erecting tower*, waveguide ladders, climbing ladder, cable safety device, installing various antenna and mounts, etc." (Dkt. 76, Ex. A, p. 2) (emphasis added).

On February 17, 2001, Richard Gallina ("Gallina") was employed by Horne Construction and was injured while performing cellular tower services in connection with Horne Construction's contract with Progress. Gallina sued Horne Construction in Hernando County, Florida, case number H027-CA-20020603. (Dkt. 82, Ex. F, Fourth Amended Complaint).[2] Gallina alleged Horne Construction "instructed [Gallina] to utilize the Gin Pole in a 'Chicago Boom' type configuration without the proper engineering backup or protocols in place [ . . . and that Horne Construction] knew or reasonably should have known ('objective standard') that the use of such method was substantially certain to result in injury or death to [Gallina]." (Dkt. 82, Ex. F, ¶ 24). According to Gallina, he "was not aware of the risks because the danger was not apparent to him and Horne failed to warn [him] of the risks of utilizing the equipment in such a manner . . ." (Dkt. 82, Ex. F, ¶ 26). Gallina also alleged that "[n]othing in [his complaint] allegations, shall be construed as an assertion that Horne, or its employee/agents, intended to injure [Gallina] as such intent is interpreted to trigger an 'expected or intended' or 'intentional injury' exclusion in any Horne insurance policy." (Dkt. 82, Ex. F, ¶ 26).

Commerce provided the primary defense for Horne Construction in connection with Gallina's lawsuit. On August 13, 2003, Commercial denied coverage under its Commercial General Liability Policy. (Dkt. 76, Ex. G). On May 18, 2005, counsel for Horne Construction asked Commercial whether it had "re-considered its coverage opinion" with regard to Gallina's claim. (Dkt. 76, Ex. I). In response, Commercial employee, Katie Johnston, responded:

---

[2] Plaintiffs cite to the Third Amended Complaint (Dkt. 76, Ex. B) arguing the allegations contained therein are relevant when determining whether Commercial breached the Umbrella Policy because it was the complaint in effect at the time Commercial initially denied coverage. While Plaintiffs' contention may be correct when determining a duty to defend, where as here, Commercial's duty to indemnify Horne Construction for the stipulated judgments is at issue, it is more appropriate to analyze the allegations of the most recent underlying complaint, which appears to be the Fourth Amended Complaint.

> I'm having some difficulty in getting full information on all our policies for Horne. I apologize and want you to know I'm still working on responding. I do need confirmation of AIG's employers' liability limit since the umbrella we provided has coverage above the AIG limit.[3]

(Dkt. 76, Ex. I).

On January 12, 2006, Commercial denied coverage for Gallina's injuries under the Umbrella Policy. (Dkt. 65, Ex. J). Specifically, Commercial denied any indemnity obligation under the workers' compensation exclusion (Exclusion 4.b(1)) and the professional services exclusion (Endorsement G106610587). (Dkt. 65, Ex. J). In the denial letter, Commercial stated that it did "not waive any other defense that [it] may have under th[e] policy." (Dkt. 65, Ex. J).

Subsequently, Horne Construction retained its own counsel who in April 2005 requested Commercial to reconsider its coverage position and attend the mediation of Gallina's claim, scheduled for May 2006. (Dkt. 76, Ex. K). Commercial did not attend the mediation and continued to deny coverage. (Dkt. 76, p. 5; Della Terza Depo., pp. 131, 134-38).

On June 2, 2006, Gallina and Horne Construction entered into a Joint Stipulation and Agreement. (Dkt. 76, Ex. L). Pursuant to the Agreement, Horne Construction consented to the entry of judgments for compensatory and punitive damages in favor of Gallina, in the amounts of five million dollars ($5,000,000) compensatory and two million dollars ($2,000,000) punitive. (Dkt. 76, Ex. M; Dkt. 65, Ex. B).

In August 2006, Gallina and Horne Construction initiated this action against Commercial and Commerce. (Dkt. 2). Plaintiffs seek a declaratory judgment against Commercial, declaring that the five million dollar ($5,000,000) judgment entered against Horne in favor of Gallina constitutes the

---

[3] It is undisputed that Commerce is part of the AIG family of insurers and that some witnesses referred to Commerce and AIG interchangeably. (Dkt. 76, p. 5, n. 14).

amount that Horne has become obligated to pay Gallina; that the professional services exclusion is inapplicable to the facts of Gallina's loss; that Commercial wrongfully denied coverage to Horne for Gallina's claims; that Commercial is obligated to indemnify Horne for the compensatory damages and, by reason of its wrongful repudiation of the policy, is obligated to indemnify Horne for the punitive judgment; and that Horne Construction is entitled to attorney's fees. (Dkt. 2).

Plaintiffs also assert a breach of contract claim, alleging Commercial breached the Umbrella Policy "by wrongfully denying coverage for any judgments and by refusing to investigate the loss and perform its express and implied duties in good faith to settle Gallina's claims that fall within the coverage afforded by the policy." (Dkt. 2, p. 30, ¶100). Plaintiffs seek judgment against Commercial in the amount of the compensatory and punitive judgments over the Commerce policy limits of one million dollars ($1,000,000), together with interest, costs, and attorney's fees. (Dkt. 2, p. 31).

Commercial has moved for summary judgment on Plaintiffs' declaratory and breach of contract claims, asserting several defenses to coverage. (Dkt. 65). Plaintiffs also move for summary judgment, arguing Commercial's defenses to coverage are untimely, have been waived, or lack merit given the facts of this case. (Dkt. 76).

### Applicable Standard

Summary judgment is proper if following discovery, the pleadings, depositions, answers to interrogatories, affidavits and admissions on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56. "An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case." *Hickson Corp. v. N. Crossarm*

*Co.*, 357 F.3d 1256, 1259-60 (11th Cir. 2004) (*internal citations omitted*). "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Id.* at 1260. All the evidence and factual inferences reasonably drawn from the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1280 (11th Cir. 2004).

Once a party properly makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, whether or not accompanied by affidavits, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 323-24. Plaintiff's evidence must be significantly probative to support the claims. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The Court will not weigh the evidence or make findings of fact. *Anderson*, 477 U.S. at 249; *Morrison v. Amway Corp.*, 323 F.3d 920, 924 (11th Cir. 2003). Rather, the Court's role is limited to deciding whether there is sufficient evidence upon which a reasonable juror could find for the non-moving party. *Id.*

### Discussion

Commercial contends summary judgment on Plaintiffs' breach of contract claim is proper because Horne Construction misrepresented the scope of its business, specifically, that its employees no longer performed tower erection work. (Dkt. 65). Alternatively, Commercial contends three provisions of the Umbrella Policy exclude Gallina's claims. Commercial relies on: (1) the "expected or intended" injury exclusion (Exclusion 4.a); (2) the professional services exclusion (Endorsement G106610587); and (3) the cross-employee injury exclusion (Exclusion 4.n(1)). (Dkt.

65).

Plaintiffs argue that Commercial's defenses are untimely or have been waived. Alternatively, Plaintiffs contend the alleged misrepresentation was not "material" to the renewal of the Umbrella Policy and that the exclusionary provisions Commercial relies on do not apply given the facts of this case. (Dkt. 76).

### Choice of Law

It is undisputed that the relevant insurance contract does not include a choice of law provision. Plaintiffs contend North Carolina law applies because the insurance contract was "issued and delivered" to Horne Construction's agent in North Carolina. (Dkt. 82, p. 7). Commercial does not dispute Plaintiffs' assertion, but argues summary judgment in its favor is proper under both Florida and North Carolina law. (Dkt. 80, p. 8).

A federal court sitting in diversity must apply the choice of law rules of the forum state. *Klaxton Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Accordingly, this Court must apply Florida's choice of law rules. Florida adheres to the rule of *lex loci contractus*, which provides that in the absence of a contractual provision specifying governing law, a contract, other than one for performance of services, is governed by the law of the state in which the contract is made. *Shaps v. Provident Life & Accident Ins.*, 244 F.3d 876, 881 (11th Cir. 2001) (citing *Fioretti v. Massachusetts General life Ins. Co.*, 53 F.3d 1228, 1235 (11th Cir. 1995)); *see also State Farm Mutual Automobile Ins. Co. v. Roach*, 945 So. 2d 1160, 1163-64 (Fla. 2006) ("[i]n the case of an insurance contract, the parties entered into that contract with the acknowledgment that the laws of that jurisdiction control their actions"). Horne Construction is a North Carolina corporation and Commercial does not dispute Plaintiffs' assertion that the Umbrella Policy was "issued and

delivered" in North Carolina. Accordingly, North Carolina law governs the parties' contractual dispute.

## Timeliness and Waiver

Plaintiffs contend Commercial's defenses are untimely or that it waived the defenses now asserted because it cited only the workers' compensation and professional services exclusions in its initial denial letter. Plaintiffs contend Commercial's additional defenses, such as misrepresentation and the "expected and intended" exclusion, were not raised in any of its coverage communications, and that Commercial's Corporate Representative did not identify the "expected or intended" injury exclusion at his deposition. (Dkt. 82, p. 12).[4]

Commercial's failure to assert all of its coverage defenses in its denial letter does not render the defenses untimely or waived. This Court agrees with the reasoning of the Supreme Court of California in *Waller v. Truck Ins. Exchange, Inc.*, 900 P. 2d 619, 636 (Cal. 1995), that an intention to waive a limitations provision is not expressed by the failure to raise that defense in a denial letter. *Id.* "A denial of coverage on one ground does not, absent clear and convincing evidence to suggest otherwise, impliedly waive grounds not stated in the denial." *Id.*; *see also Interstate Cleaning Corp. v. Commercial Underwriters Ins., Co.*, 325 F.3d 1024, 1029-30 (8th Cir. 2003) ("[a] insurer's letter denying coverage for specified reasons, which does not contain any statement excluding other defenses, does not exclude other defenses by omission") (applying Missouri law).

Commercial's position that Gallina's injuries are not covered by the Umbrella Policy has

---

[4] By separate order, Commercial's motion to amend its affirmative defenses has been granted, thereby permitting Commercial to assert both misrepresentation and the expected or intended injury exclusion as defenses to coverage. Arguably, because Commercial's responsive pleading has been amended to include these defenses, Plaintiffs' arguments regarding timeliness and wavier are moot. Nonetheless, in an effort to be thorough, Plaintiffs' arguments will be addressed.

been consistent throughout this litigation. Moreover, Commercial specifically stated in its denial letter that it did not waive any other defenses it had under the policy. *See Interstate*, 325 F.3d at 1030 (no waiver where insurer specially stated in the denial letter that it did "not waive any of the other provisions, conditions, terms, or portions of [the policy]"). Coverage under the policy may not be expanded through Plaintiffs' theory that Commercial waived its right to assert specific coverage exclusions. *See Hannah v. Nationwide Mutual Fire Ins. Co*, 660 S.E. 2d 600, 604 (N.C. App. 2008) ("courts of most jurisdictions agree that [the doctrine of waiver and estoppel] are not available to broaden the coverage of a policy so as to protect the insured against risks not included therein or expressly excluded therefrom") (citations omitted); *see also Pearce v. American Defender Life Ins. Co.*, 343 S.E. 2d 174, 466 (N.C. 1986) (doctrine of waiver cannot be applied to expand coverage).

Moreover, with regard to Commercial's misrepresentation defense, Plaintiffs' fail to demonstrate that the elements of waiver have been met. *See Mabry v. Nationwide Mutual Fire Ins. Co.*, 422 S.E. 2d 322 (N.C. App. 1992) (waiver by insurer requires (1) knowledge of the pertinent facts on the part of the insurer and (2) conduct thereafter inconsistent with an intention to enforce the condition, which leads the insured to believe the insured is still protected by the policy). The evidence supports Commercial's contention that it was not fully aware of its misrepresentation defense until the depositions of Charles Horne and Mark Rice were taken in September 2007. Katie Johnston's May 2005 representation that the Umbrella Policy provided for coverage over Commerce's primary limits of $1,000,000 was more than two years before Horne and Rice's depositions. Johnston specifically stated she had not concluded her analysis and was waiting for more information. This Court cannot therefore conclude that Commercial had knowledge of the pertinent facts, including, but not limited to, the status of Horne Communications as a shell company

and the reality that Horne Construction employees continued to erect the cellular towers after Horne Construction represented that it would cease those operations. Summary judgment on this ground therefore, is inappropriate.[5]

### Misrepresentation

Commercial seeks summary judgment on Plaintiffs' claims, arguing Horne Construction either intentionally or unintentionally made a material misrepresentation to Commercial regarding Horne Construction's business activities. Specifically, Commercial contends Horne Construction, by and through its agent, CBR, represented to Commercial that its employees would not conduct tower erection services and that a separate entity would perform that work. According to Commercial, the undisputed evidence establishes that Commercial was not willing to insure the risk associated with tower erections services and that Horne's alleged misrepresentation created an enhanced risk Commercial was unwilling to insure. (Dkt. 65, pp. 9-15). In response, Plaintiffs argue Commercial's misrepresentation defense is without merit because the alleged misrepresentation was not material to the renewal of the Umbrella Policy, as opposed to the Workers' Compensation Policy. (Dkt. 82, pp. 9-10).

By statute in North Carolina, material misrepresentations made in an application for an insurance policy, or in the policy itself, may prevent recovery under the policy. *Luther v. Seawell*, 662 S.E. 2d 1, 4 (N.C. App. 2008) (citing N.C. Gen. Stat. § 58-3-10 (2007)).[6] "An insurance

---

[5] Plaintiffs also contend Commercial waived its argument that the Commerce Workers' Compensation Policy does not qualify as "underlying insurance" because it was not listed as such in the Declarations of the Commercial Umbrella Policy. (Dkt. 76, pp. 18-25). Commercial did not move for summary judgment on this ground and did not respond to Plaintiffs' contention in its response to Plaintiffs' motion for summary judgment. Accordingly, to the extent that Commercial ever asserted this defense to indemnification, this Court concludes that the defense has been waived.

[6] North Carolina Statute § 58-3-10 provides:

contract may be avoided by the insurer if it can show that the applicant made a material misrepresentation or omission..." *See Prudential Ins. Co. v. Barden*, 424 F.2d 1006, 1009-10 (4th Cir. 1970) (applying North Carolina law). The first task is to determine whether the insured's misrepresentation was "material." *See Tharrington v. Sturdivant Life Ins. Co.*, 443 S.E. 2d 797, 800 (N. C. App. 1994). A representation is material "if the knowledge or ignorance of it would naturally influence the judgment of the insurer in making the contract, or in estimating the degree and character of the risk, or in fixing the rate of premium." *Goodwin v. Investors Life Ins., North America*, 419 S.E. 2d 766, 769 (N.C. 1992) (quoting *Tolbert v. Mutual Ben. Life Ins. Co.*, 72 S.E. 2d 915 (N.C. 1952)).

Whether a representation is material "depends upon the circumstances in each case and is usually, though not always, a question of fact for the jury." *Michael v. St. Paul Fire and Marine Ins. Co.*, 308 S.E.2d 727, 730 (N.C. App. 1983). Generally, representations made in an application for insurance are deemed "material" as a mater of law. *Michael v. St. Paul Fire and Marine Ins. Co.*, 308 S.E.2d 727, 730 (N.C. App. 1983). Additionally, "where misrepresentations are made in the form of written answers to written questions, the misrepresentations 'are deemed to be material.'" *Matter of McCrary*, 435 S.E. 2d 359, 365-66 (N.C. App. 1993) (citing *Tolbert v. Mutual Benefit Life Ins. Co.*, 72 S.E. 2d 915, 917 (N.C. 1952)).

Plaintiffs contend the misrepresentation was not material to the renewal of the Commercial Umbrella Policy because Commercial did not mention the Umbrella Policy in its November 1999

---

All statements or descriptions in any application for a policy of insurance, or in the policy itself, shall be deemed representations and not warranties, and a representation, unless material or fraudulent, will not prevent a recovery on the policy.

letter expressing concern over Horne's "new involvement in [the] erection of towers." Rather, Commercial stated it would no longer provide workers' compensation coverage if Horne Construction continued to engage in tower erection. (Dkt. 65, Ex. E). Plaintiffs argument is unpersuasive.

In its November 1999 letter, Commercial expressly stated "that if the tower erection is going to continue [Commercial] cannot remain on the account." The letter made clear that it was the dangerous nature of that business activity that concerned Commercial: "the exposure of working at heights is too sever for [Commercial] to continue." In response, Horne Construction represented that it would cease cellular tower erection. Contrary to Plaintiffs' suggestion, it is Horne Construction's representation concerning the scope of its business activities that is critical, and not whether Commercial mentioned that the Umbrella Policy would also be discontinued if it continued erecting towers. Commercial asked if Horne Construction was going to continue to erect towers. When Horne Construction responded to that request, it had a duty to do so accurately, regardless of what policy was at issue. *See North American Specialty Ins. Co. v. Wilder*, 153 F.3d 721 (4th Cir. 1998) (unpublished opinion) ("the insurer must demonstrate that it made a specific and unambiguous request for the information that was misrepresented or omitted") (citing *Prudential Ins. Co. v Barden*, 424 F.2d 1006, 1009-10 (4th Cir. 1970) (applying North Carolina law); *Matter of McCrary*, 435 S.E. 2d at 365-66 ("where misrepresentations are made in the form of written answers to written questions, the misrepresentations 'are deemed to be material.'") (citations omitted).

The undisputed evidence demonstrates that Horne Construction's business activities, specifically whether it was involved in the erection of cellular towers, had always been an important factor to Commercial in determining whether to issue insurance to Horne, including umbrella

coverage. In January 1998, in the "Policy Wide Comment," Commercial noted that Horne Construction "do[es] not erect towers or have anything to do with the phone operations." (Dkt. 65, Ex. K). The Declarations page of the Umbrella Policy in effect at the time of Gallina's injury described Horne Construction's business as the "clearing of land."[7] (Dkt. 65, Ex. A). Charles Horne testified that the clearing of land and the erection of the cellular towers are two separate services and "different facets of an entire job." (Horne Depo., p. 9).

It is undisputed that Commercial renewed the Umbrella Policy soon after Horne Construction represented to Commercial that its employees would not conduct tower erection services and that a separate entity would perform that work. Significantly, the Umbrella Policy included a "representations" section, which states that by "accepting this policy, [Horne Construction] agree[s]" that "[t]he statements in the Declarations are accurate and complete . . . . . . and [Commercial] [ ] issued [the Umbrella Policy] in reliance upon [Horne Construction's] representations." (Dkt. 65, Ex. A, Section IV - Conditions, § 14 Representations).

Moreover, the evidence demonstrates that Commercial relied on Horne Construction's misrepresentation when it issued the Employers Liability Policy, which is listed in the Declarations of the Umbrella Policy and for which the Umbrella Policy provided certain excess coverage. In 2000, when the Employers Liability Policy was subject to payroll audit, Gallina and all other employees associated with tower erection serves were categorized as "N/A covered Under Separate

---

[7] In contrast, the Workers' Compensation Policy issued by Commerce for Horne Communications listed Horne Communications' business as "iron and steel erection." (Dkt. 2, Ex. C).

15

Policy." (Dkt. 65, Ex. O).

In light of the record evidence, reasonable minds could not differ on whether Horne Construction's misrepresentation concerning its business practices, which was made just prior to renewal of the Umbrella Policy, was material to Commercial's decision to reject or accept the risk of renewing the Umbrella Policy. Although not formally part of its application for umbrella coverage, in writing, Commercial requested information from Horne Construction concerning the scope of its business activities and in writing, Horne Construction responded that it would cease tower erection services.

The undisputed evidence demonstrates that Horne Construction's business activities, specifically whether it was engaging in tower erection, was a factor Commercial considered in issuing the umbrella coverage and it was information that "would naturally influence the judgment of the insurer in making the contract or in estimating the degree and character of the risk, or in fixing the rate of premium." *Goodwin*, 419 S.E. 2d at 769. Accordingly, Horne Construction's misrepresentation was material as a matter of law. *See Michael*, 308 S.E.2d at 730 ("[w]hether such representations are material depends on the circumstances in each case . . . [b]ut in this instance we are of the opinion that the materiality of plaintiff's promise to lock the jewelry in the safe when the store was closed is too plain for debate"). Coverage under the Umbrella Policy is therefore void and summary judgment on Commercial's misrepresentation defense is **GRANTED**.[8] Accordingly, it is

---

[8] Because Commercial's misrepresentation defense voids the Umbrella Policy, this Court need not address Commercial's other coverage defenses.

16

**ORDERED AND ADJUDGED** that:

1) Plaintiffs' Motion for Summary Judgement Against Defendant Commercial Union Insurance Company (Dkt. 76) is **DENIED**.

2) Commercial Union Insurance Company's Motion for Summary Judgment (Dkt. 65) is **GRANTED**. The Clerk is directed to enter judgment in Commercial's favor and against Plaintiff.

3). The Clerk is directed to close this case.

**DONE AND ORDERED** in chambers this 30th day of September, 2008.

                                                            _____
                                                            JAMES D. WHITTEMORE
                                                            United States District Judge

Copies to:
Counsel of Record

17